UNITED STATES of America, Appellee,

v.

**Thomas E. FLAHERTY, Defendant, Appellant.**

UNITED STATES of America, Appellee,

v.

**James R. KEARNS, Jr., Defendant, Appellant.**

UNITED STATES of America, Appellee,

v.

**Stuart H. WAHL, Defendant, Appellant.**

Nos. 80–1782 to 80–1784.

United States Court of Appeals, First Circuit.

Argued Sept. 10, 1981.

Decided Nov. 12, 1981.

---

568

Nelson S. Baker, Boston, Mass., by appointment of the Court, for defendant, appellant Thomas E. Flaherty.

Jeanne Baker, Cambridge, Mass., with whom Stephanie A. Cleverdon, and Baker & Fine, Cambridge, Mass., were on brief, for defendant, appellant James R. Kearns, Jr.

William A. Brown, Boston, Mass., by appointment of the Court, with whom Brown & Prince, Boston, Mass., was on brief, for defendant, appellant Stuart H. Wahl.

Frank J. Marine, Atty. Dept. of Justice, Washington, D.C., with whom Edward L. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before ALDRICH, CAMPBELL and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

■ Thomas E. Flaherty, James R. Kearns, Jr., and Stuart H. Wahl appeal jury convictions of conspiring to receive and possess a stolen interstate shipment of beef in violation of 18 U.S.C. § 371 and of receiving and possessing a stolen interstate shipment of beef in violation of 18 U.S.C. § 659. The appellants were also indicted for aiding and abetting under 18 U.S.C. § 2, but were acquitted on that charge. Seven issues are presented for review:[1]

1. The sufficiency of the evidence to support the convictions of appellants;

2. Should the indictment have been dismissed because a witness perjured himself before the grand jury;

3. Whether appellants were deprived of a fair trial because of the Government's alleged failure to comply with discovery orders and to disclose allegedly exculpatory evidence prior to trial;

4. Whether statements of the prosecutor in his opening statement and closing argument deprived appellants of a fair trial;

5. The district court's instructions to the jury;

6. The procedure mandated by the district court for exercising peremptory challenges; and

7. Whether the fact that the trial judge remained in the presence of the jury in the absence of the parties and their attorneys requires a reversal.

We review the facts in the light most favorable to the Government. *United States v. Benmuhar*, 658 F.2d 14, 16 (1st Cir. 1981); *United States v. Ciampaglia*, 628

---

[1] Appellant Flaherty has briefed an additional issue: that the convictions should be set aside because convicted felons, whether or not their civil rights had been restored, were excluded from the jury wheel. We understood this claim to have been waived at oral argument. Even if our understanding is incorrect, we refuse to consider the claim because of lack of any record facts bearing on it. If a challenge is to be mounted to the jury selection system for the District of Massachusetts, it should follow the regular procedural format, not as an afterthought to a criminal conviction.

F.2d 632, 636 (1st Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980). The principal witnesses for the Government, Joseph Sullivan, John Farrell, and Ralph Booth Gunschel, were all accomplices of defendants.

The case started in early June, 1977, when Thomas Richard Marr, a truck driver, picked up a load of thirty-nine or forty thousand pounds of meat in Wichita, Kansas, for delivery to Hartford, Connecticut, and Brockton, Massachusetts. After delivering part of the load in Hartford on the afternoon of June 13, Marr proceeded to Brockton. Because delivery could not be made to the Brockton consignee that day, Marr and his wife, who had accompanied him, spent the night at the Holiday Inn and left the truck parked in the Holiday Inn parking lot, which is next to the Westgate Mall in Brockton.

Later that evening, Sullivan and Farrell passed the Holiday Inn on their way home after spending a hitherto unfruitful evening looking for trailer-truckloads to steal. The pair spotted a number of trucks in the Holiday Inn parking lot and determined to investigate further. Sullivan, who was driving, circled the parking lot, stopped near the trucks, and Farrell got out. The two had noticed that one of the trailer-trucks, Marr's truck, as events turned out, had a refrigeration unit. Farrell opened the side door of the trailer and discovered several white boxes marked "Beef." He reported this to Sullivan, who wanted to know more precisely what the boxes contained. Sullivan parked the car in a corner of the lot out of view of anyone inside the Holiday Inn and went over to the trailer-truck. He opened the side door, climbed into the trailer, and managed to pull out one of the boxes near the top. The box was very heavy, and Sullivan fell out of the trailer as he tried to carry it; he dropped the box and let it slide down a small hill to where the car was parked. Sullivan and Farrell left immediately for Sullivan's house in Stoughton, Massachusetts, without opening the box.

They carried the box into the kitchen and on opening it found that it contained tenderloin tips. Sullivan then telephoned Stuart Wahl to discuss the discovery.[2] He told Wahl that there was a load of meat at the Westgate Mall in Brockton that they had a good opportunity to steal. (It was stipulated at trial that the value of the meat was $16,000.) If they succeeded in doing so, Sullivan asked Wahl, could Wahl find a buyer for it? Wahl replied that he did have an outlet and could sell the beef for 65 percent of its wholesale price. Wahl also told Sullivan that if he and Farrell were able to steal the truck, they should take it to the "drop" site in Avon, Massachusetts.

Sullivan had had several conversations with Wahl earlier in 1977. In the late winter or early spring, Sullivan contacted Wahl about obtaining a "stash" or "drop" site for concealing stolen trucks. Wahl made some inquiries and found "drops" for Sullivan at the Ansel Gurney House, a restaurant and gift shop in Marion, Massachusetts, and at a warehouse in the Avon Industrial Park in Avon, Massachusetts. Sullivan visited and approved both locations. At the Ansel Gurney House he met the owner, Gunschel. In late April or early May, Wahl arranged with Gunschel to lease the freezer and stored a load of fish in it. He paid Gunschel $1,000 in cash for the rental.

After the telephone call to Wahl, Sullivan and Farrell returned to the parking lot of the Holiday Inn. Sullivan parked the car, and, after a coin toss to determine who would drive the trailer-truck away, Farrell went over to the truck. He had with him a pair of gloves, a bar, a screwdriver, and a "slammer" or "dent popper," a device used to pull the ignition system out of a car or truck so that it can be started without an ignition key. Farrell applied his tools and started the truck. While Farrell was working, Sullivan watched the entrance to the parking lot to make sure no one surprised them. After idling the engine to build up

---

**2.** He also called another person, an employee of a meat market, who played no role in the case.

air pressure in the brakes, Farrell drove the truck out of the lot. Sullivan stayed behind for a few minutes to see whether the theft had been detected.

They both took Route 27 to Route 24, where Sullivan caught up with Farrell. They then proceeded to the "drop" site at the Avon Industrial Park, where it was planned to leave the truck. Sullivan arrived at the warehouse first and was dismayed to learn that police or security men were patrolling the area and that the door to the warehouse was broken so that it could not be opened and the trailer-truck could not be parked inside the building. When Farrell arrived, both men attempted to open the door, but to no avail. Concerned about the patrol, Sullivan and Farrell decided to leave the truck next to the warehouse and to go home.

As to the next event, the testimony diverged somewhat. Farrell testified that on the way home from the Avon warehouse Sullivan stopped at a pay telephone to call Wahl. According to Farrell, Sullivan told Wahl that they had not been able to get the trailer inside the warehouse, that they had left the truck outside, and that it was up to Wahl to get the trailer-truck into the warehouse. In addition, Farrell testified that after he had picked up his car at Sullivan's house and gone home, Sullivan telephoned him and told him that he had just spoken to Wahl on the telephone and that he was going to meet with Wahl the next day to try to open the Avon warehouse doors. Sullivan's testimony contained no reference to these telephone conversations.

Sullivan did testify, however, to receiving a telephone call from Wahl early the next morning, June 14, inquiring about the success of the theft. Sullivan told him that they had had problems, and Wahl suggested that rather than discuss them on the telephone he meet him at 9:00 A.M. at his office in Stoughton, Massachusetts. Sullivan complied and met with Wahl and another man. At the meeting, Sullivan told Wahl about the problem with the door to the warehouse and asked Wahl to have it fixed, relying on his understanding with Wahl that he would have continuous access to the warehouse. Sullivan's testimony is not entirely clear as to Wahl's response; Wahl said in effect that he would try to have the door fixed but that because the owner of the warehouse did not know that stolen goods were moving in and out of it, Sullivan would have to move the truck. He suggested using the other prearranged "drop" site in Marion, Massachusetts.

Sullivan then telephoned Farrell at work to tell him that the doors could not be opened and that Wahl wanted the truck moved from the Avon warehouse. According to Farrell, Sullivan also told him that he was going to see William Daggett about finding someone else to move the truck; at this point neither Farrell nor Sullivan wanted to drive it. Farrell felt that moving the truck was Wahl's problem.

Meanwhile, Wahl had gone to the Avon warehouse to try to fix the door, but was unsuccessful. He then went to Sullivan's house at about 10:00 or 11:00 A.M. on June 14 and repeated his demand that the truck be moved.

Sullivan then telephoned Daggett at his bar, the Geneva Cafe, in Dorchester, Massachusetts, and arranged to meet with him an hour later. Sullivan met with Daggett at about noon, explained about the theft and the problem of moving the truck and asked Daggett to find a driver to drive the truck to Marion. Daggett said he would check around.

Sullivan spent the afternoon at his mother's house and returned to Geneva Cafe later that day. He met with Daggett and Thomas Flaherty outside the cafe. Daggett told Sullivan, in the presence of Flaherty, that he and a potential driver had gone to Avon to look at the truck but that they did not like the situation and would not get involved in moving it.

At some time during the day, Sullivan again telephoned Farrell at work to tell him that he had not been able to have the truck moved and that Farrell should come by his house after work. Farrell was at Sullivan's house in Stoughton when Sullivan returned from his meeting with Daggett and Flaher-

ty. Farrell and Sullivan pondered what to do, and, after a few beers, decided to move the truck themselves. Before they left, Sullivan telephoned Wahl to inform him that they were going to move the truck to Marion and asked him to alert Gunschel that the truck would be coming in. Gunschel was so advised.

Farrell and Sullivan arrived at the Avon warehouse at about 5:30 or 6:00 P.M. Farrell drove the truck and Sullivan followed in his car. They arrived in Marion at the Ansel Gurney House in the early evening and were met in the parking lot by Gunschel. The truck was backed up onto the loading platform so that the meat could be easily moved into a large freezer. Farrell broke the lock on the back doors of the trailer, and they opened it to discover that they had stolen only a half rather than a full load of meat. Sullivan and Gunschel then set to work, unloading the meat (Farrell was indisposed by a sore back). Once the meat was safely stored in the freezer, Sullivan counted the boxes (Gunschel segregated a couple for his own use), and Sullivan and Farrell left.

Farrell drove the truck away, intending to abandon it along Route 24, heading towards Marion. En route, however, he and Sullivan, who followed in his car, passed a state police speed trap. Worried that the police might be on the lookout for the truck, the pair pulled into the nearest rest stop and left the truck there, where it was found about 2:00 A.M. the next day, June 15.

When Sullivan arrived home that night, he found several messages that Daggett had called, and shortly after his return, Daggett called again. Daggett wanted to know what had happened with the truck and told Sullivan that he believed he was entitled to a share of the proceeds of the theft because of his efforts to find a driver for the truck and because he had gone down to Avon to see it. Sullivan refused but agreed to meet with Daggett the next day in Quincy, Massachusetts. Sullivan then telephoned Wahl and told him not to sell the beef the next morning because he had run into some problems. He also tele-

phoned Farrell to report on his conversation with Daggett, specifically that Daggett had gone to the Avon warehouse and was upset that they had moved the truck.

On the morning of June 15, Sullivan met with Daggett and Flaherty at a bar on Newport Avenue in Quincy. Daggett insisted that he was entitled to a share of the proceeds because he had tried to help Sullivan and Farrell. Sullivan again rejected the argument, saying that he and Farrell had new partners, but agreed to talk further with Daggett at the Geneva Cafe. The two men, together with Flaherty, then went over to the Cafe. From there Sullivan telephoned Farrell at work and told him of Daggett's demand; both men repeated to each other their opposition to cutting Daggett in on the deal. Daggett, however, then took the line from Sullivan and told Farrell that he understood Farrell's opposition but explained that he had two people in Providence who would sell the load and that he would let Sullivan and Farrell in on future, unspecified business dealings. Sullivan then returned to the line, and Farrell told him to make the decision for them. Sullivan was still inclined to reject Daggett's demand but, after Daggett reminded him of past favors and Flaherty promised to "make it up" to him, Sullivan succumbed.

Shortly after they reached their agreement, the three men were joined by James Kearns. Daggett said that Kearns would contact some persons in Providence, who would probably buy the meat. Sullivan wondered out loud whether Kearns was yet another partner, but Daggett assured him that he would take care of Kearns out of his end. It cannot be determined from the testimony whether or not Kearns heard the remarks of Sullivan and Daggett. Kearns then made a long distance telephone call. Sullivan heard him tell the party on the other end that they had a load of meat and asked whether they could make a deal to sell it. After Kearns hung up, he told the three, Sullivan, Daggett, and Flaherty, that he had a potential buyer but that the buyer needed a list of what was in the load.

Sullivan then suggested that they go down to Marion to take an inventory, and he, Daggett, and Flaherty left to do so. They got to the Ansel Gurney House about noon, and, after Flaherty spoke briefly with Gunschel, they took the inventory and left. Before their arrival, Wahl had taken his own inventory. After returning to the Geneva Cafe, they gave Kearns the inventory. He made another telephone call during which he read the list aloud and said he would see the other party later. Kearns then told the three that he had a buyer in Providence. The arrangement was that the Providence people would send a truck up to Boston, which would be met by Kearns and Flaherty, who would then loan the Providence people their car and take the truck to Marion where they would meet Daggett and Sullivan and pick up the meat. Kearns and Flaherty would then drive the truck to Providence where, if the meat was as claimed, they would receive payment and pick up their car for the return trip. Kearns and Flaherty then left the cafe, and, some fifteen minutes later, Daggett and Sullivan drove to Marion.

The four men arrived at the Ansel Gurney House about 6:00 or 7:00 P.M. and proceeded to load the meat on the truck. The truck was so heavily loaded that there was some concern whether Kearns and Flaherty would be able to make it to Providence, but they drove off without incident. Sullivan put four or five boxes of beef in his car, and he and Daggett left.

Sullivan and Daggett drove to Farrell's house in Raynham, Massachusetts. Daggett recounted their disposition of the meat and told Farrell to meet him at Howard Johnson's at 4:00 P.M. the next day to get paid. Sullivan gave Farrell a box of beef, then drove Daggett back to the Geneva Cafe, gave him two boxes of beef, and went home.

The next morning, June 16, Sullivan spoke with Wahl on the telephone. Wahl said that he, Wahl, was supposed to sell the meat. Sullivan replied that something beyond his control had come up and that someone else had gotten the meat but that

Wahl would be taken care of. That afternoon, Sullivan and Farrell went to Howard Johnson's. According to Sullivan, he and Farrell met at the V.G. Tavern after Farrell finished work, and they went to Howard Johnson's together. Farrell did not remember, however, whether he was with Sullivan or not. In any event, both men met Daggett at the swimming pool at Howard Johnson's. Sullivan remembered seeing Kearns at the bar. Daggett went inside and returned with a paper bag that contained $5,800 for Farrell and Sullivan to split. Both complained about the small amount of money, but Daggett said that the marking and weights on some of the boxes were wrong and that there were various other expenses, including the truck rental and payments to Kearns, Flaherty, and Wahl. Having no recourse, the two left.

Sullivan and Farrell were subsequently charged with several other crimes and convicted. In return for grants of immunity for the crime at issue here and other offenses and for support and protection for themselves and their families under the Justice Department's Witness Protection Program, Sullivan and Farrell testified before a federal grand jury in November, 1979, concerning this crime. Gunschel also testified before the grand jury. On July 16, 1980, the grand jury returned an indictment charging Daggett, Flaherty, Kearns, and Wahl with one count of conspiracy to receive and possess stolen goods in violation of 18 U.S.C. § 371 and one count of receipt and possession of stolen goods in violation of 18 U.S.C. §§ 659 and 2. After an eleven-day jury trial, all defendants were convicted for violating 18 U.S.C. §§ 371 and 659, but were acquitted of the aiding and abetting charge, 18 U.S.C. § 2. Daggett and Flaherty received two-year prison sentences, Kearns received an eighteen-month sentence, and Wahl received a suspended sentence of eighteen months and was placed on probation for two years. Flaherty, Kearns, and Wahl have appealed. Daggett died subsequent to trial.

## I. The Sufficiency of the Evidence

■ We turn first to Kearns's claim that the evidence did not prove that he knew the beef was stolen. An essential element of the crimes of both receipt and possession of stolen goods under 18 U.S.C. § 659 and conspiracy to receive and possess stolen goods under 18 U.S.C. §§ 371 and 659 is knowledge that the goods were stolen. *United States v. Sclamo*, 578 F.2d 888, 891 (1st Cir. 1978). Guilty knowledge may be shown by circumstantial evidence, as well as by direct evidence. *See United States v. Kilcullen*, 546 F.2d 435, 441 (1st Cir. 1976). Circumstantial evidence tending to show guilty knowledge need not compel a finding of such knowledge in order to sustain a conviction; all that is necessary is that reasonable jurors could be convinced beyond a reasonable doubt that the defendants had guilty knowledge. *Id.* at 441 (citing cases). The jury is "free to choose among various reasonable constructions of the evidence." *United States v. Gabriner*, 571 F.2d 48, 50 (1st Cir. 1978) *citing United States v. Klein*, 522 F.2d 296, 302 (1st Cir. 1975).

Turning to the evidence, we find that the following facts were presented with respect to appellant Kearns's knowledge: (1) Kearns was present in the Geneva Cafe when Sullivan asked Daggett if Kearns was another partner; (2) Kearns made a long distance telephone call to a prospective buyer, who wanted a list of the beef available; (3) Kearns transmitted the request to Sullivan, Daggett, and Flaherty; (4) Kearns made another telephone call, reporting the inventory of beef and making a deal; (5) Kearns, together with Flaherty, picked up a rental truck when they drove down to Marion to pick up the beef and then to Providence where they completed the sale; (6) Kearns was nearby when Sullivan and Flaherty were paid; (7) Kearns had to be paid out of the proceeds of the sale of the beef.

■ Kearns stresses the absence of a direct evidence that he was told in the Geneva Cafe that the beef was stolen.[3] When Kearns's actions are viewed in totality, however, the jury could conclude beyond a reasonable doubt that he was aware of the illicit nature of the goods. Kearns negotiated the sale in unusual circumstances, the beef was stored temporarily in a restaurant freezer, and Kearns arranged to transport the beef to Providence in a complicated way. The handling of the beef and the completion of the sale in such a covert way were circumstantial evidence sufficient to raise the inference that Kearns was aware that the goods were stolen. *Cf. United States v. Kilcullen*, 546 F.2d at 442 (bizarreness of transaction one factor indicating defendant's guilty knowledge); *United States v. Marquez*, 462 F.2d 620, 621 (9th Cir. 1972) (per curiam), *cert. denied*, 413 U.S. 921, 93 S.Ct. 3069, 37 L.Ed.2d 1043 (1973) (defendant's negotiation of sale of stolen goods one factor demonstrating guilty knowledge). The cases cited by appellants in support of their contention, *United States v. Gabriner*, 571 F.2d 48 (1st Cir. 1978) and *United States v. Forrest*, 620 F.2d 446 (5th Cir. 1980), dealt with defendants whose connection with the crime was far more attenuated than here.

■ Flaherty and Wahl have adopted by reference Kearns's argument that the evidence failed to establish knowledge of theft of the beef. Wahl's argument is obviously without merit: Sullivan told him the meat was stolen. The circumstantial evidence pointing to Flaherty's knowledge is even

---

**3.** Kearns makes this particular argument because the trial judge based his denial of the motion for acquittal on the "specific language" used in appellant's presence when appellant joined Sullivan, Daggett, and Flaherty at the Geneva Cafe. Appellant contends that the record contains no such specific language proving guilty knowledge. In reviewing the sufficiency of evidence, however, we are not restricted to considering whether the trial judge's view of the facts was correct. Instead, we consider all of the evidence, *cf. United States v. Wetzel*, 514 F.2d 175, 177 (8th Cir.), *cert. denied*, 423 U.S. 844, 96 S.Ct. 80, 46 L.Ed.2d 65 (1975) (when defendant presents evidence after motion for acquittal, court of appeals considers all evidence, not simply Government's case), and, as we said above, in the light most favorable to the Government.

stronger than that regarding Kearns's: Flaherty was present at and participated in the conversations with Sullivan and Daggett and with Sullivan, Daggett, and Kearns concerning disposition of the meat, Flaherty helped to inventory the beef, and Flaherty participated in sending the beef to Providence. This evidence shows that he was aware of the peculiar circumstances surrounding the beef, and the jury could properly infer knowledge that it had been stolen from it.

■ A second ground—the recent theft doctrine—also justifies a determination that Kearns knew that the beef was stolen. As enunciated in *Wilson v. United States*, 162 U.S. 613, 619, 16 S.Ct. 895, 898, 40 L.Ed. 1090 (1896), the doctrine is that:

> Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only *prima facie* evidence of guilt, may be of controlling weight unless explained by the circumstances or accounted for in some way consistent with innocence. (citation omitted).

*See United States v. Barnes*, 412 U.S. 837, 843–46, 93 S.Ct. 2357, 2361–63, 37 L.Ed.2d 380 (1976); *United States v. Brawer*, 482 F.2d 117, 124–27 (2d Cir. 1973), *cert. denied*, 419 U.S. 1051, 95 S.Ct. 628, 42 L.Ed.2d 646 (1974); *United States v. Jacobs*, 475 F.2d 270, 281 (2d Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973). Both Kearns and Flaherty had such dominion and control over the beef when they transported it to Providence as to amount to possession of the recently stolen beef. *See United States v. Marquez*, 462 F.2d at 621 (participation in sale and delivery of stolen goods constitutes constructive possession under 18 U.S.C. § 659). Because no alternative explanation of the possession was

offered, the jury could reasonably have inferred that Kearns and Flaherty knew that the meat was stolen.

Appellant Flaherty challenges his conviction under Count One of the indictment on the ground that there was insufficient evidence to establish that he joined the conspiracy. Flaherty has not indicated precisely the element or elements of conspiracy that he contends were not proved as to him, but they appear to be knowledge of the agreement, actual agreement, and intent to commit the crime of receiving stolen property.

■ "[T]he gist of conspiracy is an 'agreement to disobey or to disregard the law.' Moreover, 'a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute.'" *United States v. Mora*, 598 F.2d 682, 683 (1st Cir. 1979), *quoting United States v. Cangiano*, 491 F.2d 906, 909 (2d Cir.), *cert. denied*, 419 U.S. 904, 95 S.Ct. 188, 42 L.Ed.2d 149 (1974). Two types of intent must be proved: intent to agree and intent to commit the substantive offense. *United States v. United States Gypsum Co.*, 438 U.S. 422, 443 n.20, 98 S.Ct. 2864, 2877 n.20, 57 L.Ed.2d 854 (1978). The actual agreement must also be proved, and it may be shown solely by circumstantial evidence. *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965); *see Iannelli v. United States*, 420 U.S. 770, 777 n.10, 95 S.Ct. 1284, 1289 n.10, 43 L.Ed.2d 616 (1975).[4]

■ We conclude that there was sufficient evidence to support Flaherty's conviction on the conspiracy count. Flaherty was with Daggett when Daggett persuaded Farrell and Sullivan to cut Daggett and

---

**4.** Flaherty also suggests that it must be shown that he committed an overt act in furtherance of the conspiracy. As a matter of law, he is wrong: only one member of a conspiracy need commit an overt act. *United States v. Driscoll*, 449 F.2d 894, 897 (1st Cir. 1971), *cert. denied*, 405 U.S. 920, 92 S.Ct. 948, 30 L.Ed.2d 790 (1972). As a matter of fact, his participation in

moving the beef from Marion to Providence is a sufficient overt act to establish a conspiracy. *See United States v. Palmieri*, 630 F.2d 192, 200 (3d Cir. 1980), *cert. denied*, 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981) (overt act need not be illegal), *United States v. Andreen*, 628 F.2d 1236, 1248 (9th Cir. 1980) (same).

himself in on the deal. Sullivan testified that Flaherty participated in the discussion by promising him that he and Farrell would receive favors in the future. Flaherty also heard Kearns's report of his conversation with the prospective buyer in Providence and participated in taking inventory of the beef. He later accompanied Kearns to pick up the rental truck, helped to load the beef into the truck, and drove it down to Providence with Kearns. From this evidence, the jury could quite reasonably have inferred that Flaherty intended to receive and possess the stolen beef and that he intended to and did enter into an agreement with others to do so. These facts do not present a situation where Flaherty was merely in the presence of one of the other wrongdoers. *See United States v. Mehtala*, 578 F.2d 6, 10 (1st Cir. 1978). He took an active role in the disposition of the beef, and the jury could quite properly find that he joined the conspiracy.

Appellant Wahl's evidentiary attack on his conviction comes before us as an attack on the trial court's refusal to instruct the jury on multiple conspiracies. Wahl argues that the theory of his defense was multiple conspiracies and that the trial court's refusal so to instruct made it impossible for the jury to assess conflicting evidence properly. Alternatively, Wahl argues that the trial court's refusal to order the Government to immunize him from other offenses denied him due process by precluding him from testifying that he was involved only in those other offenses and not in the conspiracy here.

With respect to jury instructions, it is the rule in this court that

[i]t is reversible error for the court to refuse a request to instruct as to defendant's theory of the case if there is evidence to support it . . . .

The rule is equally applicable to situations where special facts present an evidentiary theory which if believed would defeat the factual theory of the prosecution. . . . However, the defendant must tender an instruction that is appropriate in form and substance. . . . Where he

fails to accomplish this, the court is not obligated to give an instruction unless a particularly·sensitive defense is involved . . . or the facts adduced at trial are so complex and confusing that an understanding of the issues would be beyond the grasp of the jury.

*United States v. Leach*, 427 F.2d 1107, 1112–13 (1st Cir.), *cert. denied*, 400 U.S. 829, 91 S.Ct. 57, 27 L.Ed.2d 59 (1970) (citations omitted).

Wahl's requested instruction reads as follows:

The Government must prove the particular conspiracy charged. That is, if you find two or more separate conspiracies then you must acquit all defendants.

According to Wahl, this instruction was intended to assist the jury in weighing the evidence, specifically in evaluating Wahl's claim that he was involved in conspiracies with Sullivan and Farrell to steal a load of fish but not in the conspiracy here involving beef. We must consider whether the requested instruction met the two *Leach* tests of supporting evidence and appropriate form and substance.

Wahl points to the cross-examination of Farrell as the source of sufficient supporting evidence. Farrell testified that he and his partner had obtained a load of fish from a truck driver and that "Stuart [Wahl] was . . . supposed to off-load [*sic*] the fish load." This testimony, although minimal, was sufficient to suggest that Wahl was involved in a separate conspiracy with Farrell concerning a load of fish.

We turn, then, to consider whether the requested instruction was in a form that appropriately pointed out this possible second conspiracy. We agree with the Second Circuit's decision in a similar situation and hold that it was not. *See United States v. Tramunti*, 513 F.2d 1087 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). As the Second Circuit observed, "[t]he request . . . to charge that if multiple conspiracies had been proven then the Government has failed to prove the single conspiracy alleged in the indictment and there must be acquittal, fails to

take into account the very real possibility that *one* of the proven conspiracies was the single conspiracy charged." *Id.* at 1107 (emphasis in original). Wahl's requested instruction misinterprets the doctrine of variance.

 Variance occurs when the facts proved at trial are different than those alleged in the indictment. Variance in the proof is grounds for reversal only when it affects the defendant's "substantial rights." *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935); *United States v. Tremont,* 429 F.2d 1166, 1169 n.5 (1st Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 63, 27 L.Ed.2d 63 (1970). "Substantial rights" is a term meant to provide two basic protections to the defendant: that he have sufficiently specific information about the charges against him so that he can prepare an effective defense and will not be surprised at trial and that he not be subject to another prosecution for the same offense. *Berger v. United States,* 295 U.S. at 82, 55 S.Ct. at 630; *United States v. Calabro,* 467 F.2d 973, 983 (2d Cir. 1972), *cert. denied,* 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973). In appropriate cases, the doctrine of variance also includes protection against the possibility of a prejudicial "spillover" effect, *see United States v. Toliver,* 541 F.2d 958, 962–63 (2d Cir. 1976); *United States v. Perez,* 489 F.2d 51, 60 (5th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). In a case involving several defendants, the court must take care that evidence against one defendant is not misinterpreted by the jury and used as the basis for convicting another defendant not connected to the evidence. If the Government proves more conspiracies than the one charged in the indictment, a defendant involved in one conspiracy may not be convicted on the basis of evidence that relates only to a separate conspiracy. In evaluating whether convictions were the result of such confusion on the part of the jury, the reviewing court must look to the number of defendants involved and the trial judge's efforts to reduce the possibility of "spillover." *See, e.g., Kotteakos v. United States,* 328 U.S. 750, 766–74, 66 S.Ct. 1239, 1248–52, 90 L.Ed. 1557 (1946)(number of defendants); *Blumenthal v. United States,* 332 U.S. 539, 560, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947)(trial judge's instructions).[5]

 The instruction submitted by Wahl assumed that if the jury found that more than one conspiracy existed, its decision would reflect a fatal variance; it would be based on facts mistakenly ascribed to the wrong defendants. We do not agree. The jury could have found a second conspiracy involving Wahl, Sullivan, and Farrell regarding a load of fish, but this finding would not have interfered in any way with a finding of the conspiracy charged between Wahl, Sullivan, Farrell, Daggett, Flaherty, and Kearns regarding a load of beef. The indictment gave Wahl sufficient notice of the facts involving the meat theft that the Government proved at trial. In addition, the Government presented sufficient evidence to convict Wahl of conspiracy to receive and possess the beef. His conviction could not, therefore, have been based on the fish conspiracy which might later give rise to a prosecution. With respect to any "spillover" effect, we find no prejudice. Only four defendants were tried together for offenses involving one load of beef, so the jury was unlikely to confuse events and defendants. Moreover, the trial court specifically instructed the jury to consider each of the defendant's cases separately and to consider only the evidence introduced as to each defendant.[6]

---

5. In a number of opinions, the Second Circuit has discussed the problem of variance in conspiracy prosecutions. *See United States v. Toliver,* 541 F.2d 958, 962–63 (2d Cir. 1976); *United States v. Sir Kue Chin,* 534 F.2d 1032, 1035 (2d Cir. 1976); *United States v. Bertolotti,* 529 F.2d 149, 154–55 (2d Cir. 1975); *United States v. Miley,* 513 F.2d 1191, 1206–10 (2d Cir.), *cert. denied,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975); *United States v. Cirillo,* 499 F.2d 872, 888 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974).

6. A different multiple conspiracy view of the facts is also possible here, although Wahl does not urge this view on us. Under this view, the evidence introduced at trial proved two conspiracies, both attempts to dispose of the stolen

Finally, Wahl's requested instruction was inappropriate for a second reason. It was an all-or-nothing instruction requiring acquittal of all defendants even if only one was shown not to be involved in the conspiracy. This result is "wholly erroneous." *United States v. Estrada*, 441 F.2d 873, 878 (9th Cir. 1971). *See United States v. Kelly*, 349 F.2d 720, 757–58 (2d Cir. 1965), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966).*

Our review of the evidence convinces us that it was sufficient to sustain the convictions of all defendants.

## II. *The Indictment*

Appellants next attack their convictions on the grounds that they were the product of an invalid indictment because it was based on perjured testimony. We begin with the commonplace that "[a]n indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). *See Lawn v. United States*, 355 U.S. 339, 349–50, 78 S.Ct. 311, 317–18, 2 L.Ed.2d 321 (1958). A grand jury may consider incompetent evidence but cannot itself violate a constitutional privilege. *United States v. Calandra*, 414 U.S. 338, 346, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). In a particular case, however, it is within the discretion of the trial court to dismiss an indictment if it is based on incompetent or illicit evidence. *E.g., Truchinski v. United States*, 393 F.2d 627, 632 (8th Cir.), *cert. denied*, 393 U.S. 831, 89 S.Ct. 104, 21 L.Ed.2d 103 (1968); *United States v. Tane*, 329 F.2d 848, 853 (2d Cir. 1964); *Carrado v. United States*, 210 F.2d 712, 717 (D.C.Cir. 1953), *cert. denied*, 347 U.S. 1018, 74 S.Ct. 874, 98 L.Ed. 1140 (1954). To a lesser extent, the court of appeals has the supervisory power to make similar dismissals, *United States v. Basurto*, 497 F.2d 781, 793–94 (9th Cir. 1974) (Hufstedtler, J., concurring); *United States v. Estepa*, 471 F.2d 1132, 1136 (2d Cir. 1972), but it will reverse the trial court only for abuse of discretion. *United States v. Tane*, 329 F.2d at 853.

The use of perjured testimony before a grand jury has proved troublesome to other circuits, *compare United States v. Basurto, supra, with United States v. Bracy*, 566

---

meat, one between Wahl, Farrell, and Sullivan and the other between Daggett, Farrell, Flaherty, Kearns, and Sullivan. Even under this analysis of the case, however, a multiple conspiracy instruction would have been inappropriate. The indictment still gave Wahl ample notice of the incriminating facts alleged against him, and his conviction in this case will bar future prosecutions involving the beef but not prosecutions involving fish. Furthermore, the proof of the two conspiracies, as supposed here, did not involve such confusing evidence that, in light of the trial court's admonition to consider each defendant's case separately, evidence that was applicable only against the other three defendants "spilled over" to prejudice Wahl.

Had it been raised directly, the variance question also would cause us to consider whether, if Wahl was involved in a conspiracy only with Farrell and Sullivan, he was improperly convicted of the substantive offense of receipt and possession under 18 U.S.C. § 659 on the jury's mistaken impression that he was vicariously liable for the acts of the other conspiracy involving the other defendants. *See Pinkerton v. United States*, 328 U.S. 640, 646–48, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946). Ample evidence was introduced, however, to convict Wahl of the substantive offense independent of any conspiracy. The beef was stolen and was in interstate commerce, Wahl knew that it was stolen because of Sullivan's reports to him, and Wahl was in at least constructive possession of the beef at Marion and Avon because he had helped set up the "drop" sites there. *See United States v. Cordo*, 186 F.2d 144, 146–47 (2d Cir. 1951).

* Wahl's alternative argument that he should have been granted immunity for his involvement in conspiracies involving fish so that he could testify about his noninvolvement in the beef conspiracy here is utterly without merit. Assuming that a grant of immunity to a defense witness can be required in some instances, under the most lenient rule regarding court-ordered immunization of defense witnesses, *Government of Virgin Islands v. Smith*, 615 F.2d 964, 972 (3d Cir. 1980), Wahl failed to make the necessary showings. Specifically, he failed to proffer testimony that was clearly exculpatory and failed to show that it was essential. *Id.* As we did in *United States v. Davis*, 623 F.2d 188, 192–93 (1st Cir. 1980), we leave open the question of when, if ever, due process might require immunization of defense witnesses.

F.2d 649, 654–56 (9th Cir. 1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978), but the instant case presents the issue to this court for the first time. Appellants urge that *United States v. Basurto* supplies a rule on perjured testimony appropriate for this court and this case.[7] The Government argues, however, that *United States v. Basurto* has been eroded by subsequent cases in the Ninth Circuit and that the sounder view places few restrictions on the presentation of evidence to the grand jury.

The rule announced in *Basurto* was that a defendant may not be tried "on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached." *United States v. Basurto,* 497 F.2d at 785. When a witness changed his grand jury testimony in a way harmless to the defendant and when defense counsel was aware of the change but failed to move to dismiss before trial, however, the Ninth Circuit refused to hold the indictment invalid. *United States v. Bowers,* 534 F.2d 186, 193 (9th Cir.), *cert. denied,* 429 U.S. 942, 97 S.Ct. 360, 50 L.Ed.2d 311 (1976). In a case not involving perjured testimony, the Ninth Circuit later suggested that "only in a flagrant case, and perhaps only where knowing perjury, relating to a material matter, has been presented to the grand jury should the trial judge dismiss an otherwise valid indictment . . . ." *United States v. Kennedy,* 564 F.2d 1329, 1338 (9th Cir. 1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978). In *United States v. Bracy,* 566 F.2d at 654–56, the Ninth Circuit distinguished *Basurto* on its facts and noted defense counsel's failure to move to dismiss in timely fashion

but also suggested that the *Basurto* rule had been limited by *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), a decision that characterized material evidence as evidence creating a reasonable doubt that did not otherwise exist.[8]

On the facts before us, we do not decide whether to adopt any of the Ninth Circuit's rules, or, indeed, any other rule.[9] The perjured testimony in the instant case consisted of Gunschel's testimony relating to a lease of the freezer at the Ansel Gurney House where the beef was stored and to his recollection of how many people brought the stolen beef to the freezer and who took inventory of it. Before the grand jury, Gunschel testified that a James Henderson had signed a lease that Wahl had given Gunschel for the freezer and that he had seen Daggett at some point but that he did not remember where. At trial, Gunschel admitted that these statements were fabrications: Gunschel had himself signed the fictitious name of James Henderson to the lease and Gunschel did remember more specifically that he had seen Daggett at the freezer.

Even were we to adopt the *Basurto* rule, these falsehoods are not sufficiently material, even under the most lax standard of materiality. The evidence of the dealings between Wahl and Sullivan connected Wahl to the conspiracy to dispose of the stolen beef in such a way that the nature of the lease of the freezer from Gunschel is irrelevant. Indeed, the lease appears to relate to the other supposed conspiracies between Wahl, Gunschel, Farrell, and Sullivan involving fish. The perjury surrounding the identification of Daggett was similarly immaterial in that it did not bear on the other evidence of dealings between

7. Appellants also rely on *United States v. Gallo,* 394 F.Supp. 310 (D.Conn.1975), but that case involved a number of factors, especially conscious misrepresentation of evidence to the grand jury by the prosecuting attorney, that are absent here.

8. The passage in *Bracy* discussing the limitation on *Basurto* appears to be dictum only, although we do not presume to impose our interpretation on the Ninth Circuit.

9. A similar course has been followed by the two other circuits that have considered the Ninth Circuit's decisions. *Talamante v. Romero,* 620 F.2d 784, 790 (10th Cir.), *cert. denied,* 449 U.S. 877, 101 S.Ct. 223, 66 L.Ed.2d 99 (1980); *United States v. Cathey,* 591 F.2d 268, 272 (5th Cir. 1979).

Flaherty, Kearns,.Wahl, Sullivan, and Farrell.

### III. *Discovery Orders and Failure to Disclose Exculpatory Evidence*

Appellants contend that they were deprived of a fair trial because the Government failed to comply with discovery orders issued by the magistrate and because the Government failed to make timely disclosure of exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny. The Government responds that it did comply with the magistrate's orders and with *Brady* and acknowledges that it did not comply with the magistrate's order to turn over portions of its investigative file at the close of its case in chief but argues that this order was properly reversed by the trial court.

We turn first to the most difficult question presented here, the trial court's reversal of the magistrate's order that the Government disclose the information in its investigative file "directly applicable" to Kearns, Flaherty, and Daggett [10] at the close of the Government's case in chief. The magistrate issued the order on September 3, 1980. The Government refused to comply with the order. After the Government had presented its case, defendants moved that the trial court compel the Government to make the ordered disclosure. The court denied the motion on the grounds that the magistrate did not have jurisdiction to make orders to become effective during the course of trial.

The jurisdiction of United States magistrates in Massachusetts is set forth in 28 U.S.C. § 636 and in the Rules for United States Magistrates in the United States

District Court for the District of Massachusetts. The magistrates are empowered to hear a variety of pretrial matters; decisions they make may generally be classified as either self-operating or non-self-operating. *See Webb v. Califano*, 468 F.Supp. 825, 828 (E.D.Cal.1979). This distinction arises because magistrates are generally authorized to hear and determine all pretrial procedural and discovery motions, 28 U.S.C. § 636(b)(1)(A); Magistrates Rules 2, 7, but are authorized to make only proposed findings and recommendations after hearing certain motions.[11] The district court must approve these findings in order for them to become final. 28 U.S.C. § 636(b)(1); Magistrates Rule 3. Speaking broadly, the rationale for this distinction is that only an Article III court, not a magistrate, may constitutionally enter a final judgment; a magistrate is, therefore, authorized to make only those determinations that do not constitute final judgments. *See Reed v. Board of Election Commissioners*, 459 F.2d 121, 123 (1st Cir. 1972). The practical effect of the distinction between self-operating and non-self-operating decisions is that a self-operating order is valid when made and a party objecting to it must appeal the order to the district court within ten days, Magistrates Rule 2(b), whereas a non-self-operating order is not valid until entered by the district court. Thus, a non-self-operating order will be reviewed to some degree even though no party files timely objections within ten days as required under 28 U.S.C. § 636(b)(1), *Webb v. Califano*, 468 F.Supp. at 829–30. Although a party may not object to a self-operating order after the ten-day period has passed, the District Court of Massachusetts may reconsider any order sua sponte at any time. Magistrates Rule 2(b).

---

**10.** Wahl did not join in the original discovery motion.

**11.** These motions include motions for injunctive relief (including preliminary injunctions but excluding motions for temporary restraining orders), motions for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by a defendant, to suppress evidence in a criminal case, to dismiss or permit the maintenance of a

class action, to dismiss for failure to state a claim upon which relief may be granted, to dismiss an action involuntarily, for judicial review of administrative determinations, and for review of default judgments, applications for post-trial relief made by individuals convicted of criminal offenses, and prisoner petitions challenging conditions of confinement. 28 U.S.C. § 636(b)(1)(A), (B); Magistrates Rule 3(a).

■ The discovery order at issue here was a valid, self-operating order. Although the Government failed to object to the order within the required ten-day period,[12] the trial court had the right to reconsider the order sua sponte.[13]

■ Having determined that the trial court could review the order, we turn to the merits of the trial court's decision. We note at the outset that under Federal Rule of Criminal Procedure 52(a), "[a]n error in administering discovery rules is not reversible unless it is shown that the error was prejudicial to the substantial rights of the accused." *United States v. Harris*, 542 F.2d 1283, 1291 (7th Cir. 1976) (citations omitted). *Accord, United States v. Haldeman*, 559 F.2d 31, 78 n.112 (D.C.Cir.1976); *United States v. Owen*, 492 F.2d 1100, 1110 (5th Cir.), *cert. denied*, 419 U.S. 965, 95 S.Ct. 227, 42 L.Ed.2d 180 (1974); *Hansen v. United States*, 393 F.2d 763, 770 (8th Cir.), *cert. denied*, 393 U.S. 833, 89 S.Ct. 103, 21 L.Ed.2d 103 (1968). Appellants have made no showing in this case that their substantial rights were in any way prejudiced by the nondisclosure of the Government's investigative file. They had no statutory right to the material, and other orders had met the appellants' constitutional right to exculpatory evidence.[14] We, therefore, find no grounds for reversing the trial court, even if the court erred in denying appellants' motion to compel compliance with the magistrate's order. *See United States v. Pantohan*, 602 F.2d 855, 858 (9th Cir. 1979) (harmless error for trial court to fail to make "clearly erroneous" or "contrary to law" finding, as required under 28 U.S.A. § 636(b)(1)(A), when overturning magistrate's order).

■ We do not decide the question whether a magistrate may issue a discovery order that becomes effective during trial. The question seems unlikely to arise often because, at least under the Magistrates Rules in Massachusetts, the trial court will always be able to review such orders, and we assume that in the future the Government will make timely objection to a self-operating order on the merits. We note, nevertheless, that the trial court's opinion that the magistrate's jurisdiction of "pretrial matters" under 28 U.S.C. § 636(b)(1)(A) means matters occurring and ending before trial commences seems to run contrary to the suggestion in the Federal Rules of Criminal Procedure that pretrial motions are motions capable of determination without trial of the general issue. Fed.R.Crim.P. 12(b). A pretrial matter within the magistrate's jurisdiction would thus seem to be a matter unconnected to issues litigated at trial and not defined with respect to the time of the trial.

Appellants also argue that the Government failed to make other required discovery under unchallenged discovery orders and under *Brady*. According to appellants, three pieces of evidence in particular were not disclosed or were not disclosed on time: the alleged promises of the Government not to oppose Farrell's and Sullivan's motions for sentence reduction, Gunschel's perjurious statements before the grand jury, and inconsistencies in the testimony of Farrell and Sullivan. The Government replies that there were no promises not to oppose Farrell's and Sullivan's motions (and that otherwise promises to Farrell and Sullivan were fully disclosed), that Gunschel's perju-

---

**12.** When the order was considered at trial, at the close of the Government's case, the Government stated that it had originally intended to make an objection to the order at the beginning of trial. Even if it had done so, however, the Government would have acted after the ten-day period had passed.

**13.** We have some sympathy for the appellants' contention that it is unfair for the Government to have the order overturned, where the Government did not follow the rules. We do not see, however, how appellants were preju-

diced by the act of review itself, and our decision is dictated by the rules.

The Government makes an argument that the ten-day period applies only if a de novo determination is sought in the district court. This argument is based on statutory provisions governing non-self-operating orders and is irrelevant here.

**14.** We address below the separate question whether the Government fulfilled its duties under *Brady* and its progeny.

ry was neither material nor exculpatory, and that the inconsistencies between Farrell and Sullivan were not material.

The pertinent provision of the magistrate's discovery order granted appellants' motion [15] that was styled "Joint Motion for Exculpatory Evidence" and noted that "[t]he government has the continuing duty to furnish exculpatory evidence throughout the trial." The appellants' motion asked in relevant part for a "full and complete statement of all promises, rewards, and/or inducements of any kind made by the government . . . to induce or encourage the giving of testimony or information and made to . . . any prospective witness whom the Government intends to call at the trial. . . ." and for "[a]ny evidence which may be used to impeach or discredit any witness the government intends to call at the trial . . ., particularly, but not exclusively, inconsistent statements of a witness or between witnesses. . . ." The motion asked for the material prior to trial. At trial, appellants complained about the Government's delay in furnishing statements of promises or rewards, but the trial court ruled that disclosure of each statement as to a witness before that witness testified would satisfy discovery requirements. Appellants later moved for mistrials on the ground that complete statements of promises or rewards had not been supplied to them. The trial court denied these motions. With respect to Gunschel's perjury, the trial court agreed with appellants that the Government should have disclosed it earlier but declined to prohibit Gunschel from testifying or to dismiss the indictment and, as a sanction, ruled that Gunschel not be allowed to testify to any prior identifications. Appellants also moved to dismiss on the grounds that the Government had failed to disclose the inconsistencies between Farrell's and Sullivan's statements. This motion, too, was denied.

Our starting point in analyzing appellants' claims is *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), which classified three different disclosure obligations on the part of the Government in a criminal prosecution. First, if the prosecution's case includes undisclosed perjury that the prosecution knew or should have known of, and "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," the conviction must be set aside. *Id.* at 103, 96 S.Ct. at 2397, *citing Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). Second, if defendant makes a pretrial request for specific evidence that goes unfulfilled (or unchallenged) and if the suppressed evidence "might have affected the outcome of the trial," the conviction must also be overturned. *Id.* at 104, 55 S.Ct. at 340, *citing Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A prosecutor's failure to respond to a specific and relevant request is "seldom, if ever excusable." *Id.* at 106, 55 S.Ct. at 340. Finally, if no request or only a general request for evidence is made, and "if the omitted evidence creates a reasonable doubt that did not otherwise exist," the conviction must be reversed. *Id.* at 112, 55 S.Ct. at 341. "[T]he omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 112–13, 55 S.Ct. at 341–42 (footnote omitted). *See also United States v. Imbruglia*, 617 F.2d 1, 4–5 (1st Cir. 1980).

The evidence at issue here falls into the first (Gunschel's perjury) and second (alleged promises and inconsistencies in testimony) categories. The perjury and the inconsistencies in testimony came out at trial. Although the Government cannot exactly be said to have disclosed this information, the question before us concerning this evidence is not the usual question of suppression or nondisclosure of evidence but whether the time at which appellants learned of

---

**15.** Wahl did not join in the motion.

this evidence was so late as to deprive them of due process. *See United States v. Pollack,* 534 F.2d 964, 973 (D.C.Cir.), *cert. denied,* 429 U.S. 924, 97 S.Ct. 324, 50 L.Ed.2d 292 (1976); *United States v. Elmore,* 423 F.2d 775, 779 (4th Cir. 1970); *United States v. Deutsch,* 373 F.Supp. 289, 290–91 (S.D.N.Y.1974).

The Government's alleged promises not to oppose the sentence reduction motions present the question of the propriety of suppression or nondisclosure of evidence. The Government insists that no promises were made as part of their plea bargaining not to oppose Farrell's and Sullivan's motions for sentence reduction, which were granted. The substance of the bargains was otherwise disclosed. Appellants base their argument that such promises were made on Sullivan's testimony that his lawyer told him before the sentence reduction hearing that the Government would not oppose the motion. Farrell testified only that the Government did not oppose his motion, but, appellants contend, given Farrell's incorrect testimony on other elements of his plea bargain and the likelihood that Farrell and Sullivan would be treated similarly, the Government must also have promised not to oppose his motion for reduction of sentence.

 We believe that the Government must have made a conscious decision not to oppose Farrell's and Sullivan's motions, *see United States v. Sockel,* 368 F.Supp. 97, 97–98 (W.D.Mo.1973) (motion granted because Government failed to oppose), and that that decision was communicated to counsel for Sullivan. The evidence does not indicate, though, whether the decision was made to induce or encourage Farrell or Sullivan to testify, which would have made it discoverable under the magistrate's order. Nevertheless, even if the Government had promised not to oppose the motions, the

failure to disclose these promises does not constitute reversible error.[16] The Government's possible delinquency here is one of those rare instances where failure to disclose or otherwise to respond is excusable, *see United States v. Agurs,* 427 U.S. at 106, 96 S.Ct. at 2398. When the plea bargains with Farrell and Sullivan are viewed in their entirety, the elements omitted here had comparatively little significance, and we cannot say they might have affected the outcome of the trial. The appellants were apprised of all of the other promises made to Farrell and Sullivan in return for their testimony. Appellants were able to cross-examine Farrell and Sullivan at length concerning the promises disclosed. Thus, even if they had been able to cross-examine on the basis of the promises not to oppose the reduction motions, appellants' attack on the witnesses' credibility would have been cumulative. Moreover, as we have noted before, evidence of Government promises to treat witnesses leniently, which is the nature of the promises not to oppose the reduction motions, has less impeaching impact than evidence of promises not to prosecute, which was disclosed here. *See United States v. Bynum,* 567 F.2d 1167, 1170 (1st Cir. 1978).

 We turn to consider the question of timing of the disclosure of Gunschel's perjury and the inconsistent statements of Farrell and Sullivan. In evaluating a challenge to the timing of disclosure, we must make a two-step inquiry. *See United States v. Strahl,* 590 F.2d 10, 13 (1st Cir. 1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1237, 59 L.Ed.2d 468 (1979). First, we must determine whether the disclosed evidence was material within the meaning of the appropriate *Agurs* standard because, if it were not, even its nondisclosure would not be reversible error. If the evidence was material, we turn to the second step, wheth-

---

**16.** Although the Government has not so argued, it is possible to characterize the dispute before the trial court respecting nondisclosure of the alleged promises as a challenge to appellants' request for promises. Under *United States v. Agurs,* 427 U.S. 97, 106, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976), the Government

may either disclose or submit the problem to the trial court. The question then arises whether the Government's challenge to the request came too late. In view of our discussion of the timing of disclosure of the other evidence, we conclude that it did not.

er defendant was able to use the disclosed material effectively in preparing and presenting his case. *United States v. Pollack*, 534 F.2d at 973. Although perjury comes within the first category of *Agurs* rather than the second, as does requested exculpatory evidence, the same standard governing the timing of disclosure should apply to perjury as applies to inconsistent statements. Where material evidence of perjury or other exculpatory facts come out at trial, the jury can take it into account. We need not attempt to estimate its probable effect on the jury or to construct a standard to reflect that impact when the evidence is not disclosed. The problem of the timing of disclosure of that evidence is the same for defendant no matter how the material is classified: timing of disclosure affects preparation and presentation of the case. Whether the timing prevents effective presentation and preparation, the standard we must apply, will vary greatly depending on the contents of the material in the context of the case, but whether the material is classified as perjury or requested or unrequested exculpatory evidence will be irrelevant. The factors we will look to in determining whether the timing of disclosure interfered with effective preparation and presentation include the time between disclosure and defendant's use of the evidence and the impact the disclosed evidence had on other evidence at trial.

Appellants assert that the evidence of inconsistent statements and perjury was revealed too late for them to prepare for trial. In particular, counsel for Kearns argues that knowledge of Farrell's statements inconsistent with Sullivan's and of Gunschel's perjury was vital to his trial strategy. According to counsel for Kearns, Sullivan was the only witness to link Kearns directly with the crimes, and counsel decided not to cross-examine him on the theory that Farrell and Gunschel would contradict him. Had counsel known of the inconsistencies and perjury prior to the time Sullivan, the first principal witness, testified, counsel would have cross-examined him, but this evidence did not come out until after Sullivan had left the stand. Kearns's trial strat-

egy was, it is argued, destroyed. The trial court offered to recall Sullivan so that counsel could cross-examine him, but counsel for Kearns declined on the grounds that the recall would call attention to Sullivan in the way he was trying to avoid.

Appellants identify two pieces of inconsistent testimony about which they complain. First, they note that Farrell's testimony was that when Daggett and Sullivan came to his house with some beef after the remainder had been sent to Providence, Daggett said that he and Flaherty had transported the meat to Providence. Sullivan testified, though, that Kearns and Flaherty had driven the beef to Providence. Second, they point out that Farrell testified that he alone had picked up the money from the beef sale at Howard Johnson's, but that Sullivan testified that he had accompanied Farrell. In addition, Sullivan testified to having seen Kearns at the bar at Howard Johnson's; Farrell's testimony made no such reference. Furthermore, Farrell testified that when Daggett made the payoff, Daggett said that Wahl and Kearns had to be paid as well; Sullivan's testimony was that Daggett had mentioned only Wahl's name. The Government claims that there were no material inconsistencies between Farrell's and Sullivan's pretrial statements but does concede that their trial testimony varied at times, for example, with respect to the payoff at Howard Johnson's. Upon examination of the record, we find a further inconsistency in the testimony of Farrell and Sullivan. Farrell testified that after he and Sullivan had left the truck at the Avon warehouse, Sullivan had telephoned Wahl and told him about their inability to get the truck into the warehouse. Farrell also testified that later that night, Sullivan telephoned him at home and told him he was going to meet Wahl the next day to try to open the warehouse doors. Sullivan's testimony contained no reference to these conversations. For purposes of our discussion, we will assume that these inconsistencies reflected inconsistencies in the pretrial statements, which was the evidence requested.

We must first consider whether this evidence was material within the appropriate meaning of *Agurs, i.e.,* whether it might have affected the outcome of the trial. *See United States v. Strahl,* 590 F.2d at 13. Considered as substantive evidence, the inconsistencies bear on Kearns's and Wahl's involvement in the crime. The inconsistent testimony is at best cumulative as to Wahl because other uncontradicted testimony about his conversations and dealings with Sullivan fully established his participation in the crimes. With respect to Kearns, Sullivan and Farrell contradicted each other twice about Kearns's involvement, but each remembered Kearns's involvement at one of those times, so neither witness really exculpated Kearns. Moreover, Sullivan's other uncontradicted testimony established Kearns's involvement. Considered as impeaching evidence, these inconsistencies undermined the credibility of Farrell and Sullivan. Yet given appellants' opportunity to cross-examine both witnesses on a variety of other impeaching matters, and the substantial agreement of their testimony, whatever additional cross-examination might have been afforded by earlier disclosure of Farrell's statements could not have affected the outcome of the trial.

Even if some of the inconsistencies might be deemed material, under our second inquiry the supposed delay in their production did not prevent defendants from preparing and presenting their cases effectively. Copies of Farrell's pretrial statements were given to defense counsel four days before Farrell testified and a few days after Sullivan had testified.[17] Appellants were able to cross-examine Farrell on the inconsistencies. The only prejudice was to their ability to cross-examine Sullivan. Assuming arguendo that Kearns's counsel was justified in declining to have Sullivan recalled because it would have been at least equally prejudicial to Kearns's case, the cross-examination that would have been possible had the inconsistencies been known earlier would not have detracted much from Sullivan's testimony. The testimony attacked would have been Sullivan's recollection that Kearns had driven the truck with Flaherty to Providence and that Kearns had been in the Howard Johnson's bar on the afternoon of the payoff. As to the first piece of testimony, Kearns had only Farrell's hearsay testimony to use against Sullivan's eyewitness testimony. As to the second, the fact that Kearns was in the bar was insignificant compared to the other facts establishing his involvement in the crime and even if successfully attacked would not have altered the verdict.

We now examine the time of disclosure of Gunschel's perjury. In arguing that the timing of disclosure violated due process, appellants have not identified specific portions of Gunschel's grand jury testimony as perjurious but assert only that he perjured himself before the grand jury. In urging dismissal of the indictment at trial, appellants pointed to Gunschel's lies about the lease of the freezer at the Ansel Gurney House. Our reading of the record also reveals that Gunschel was not completely truthful in his testimony about seeing Daggett at the freezer. Had this perjury not been disclosed at all, we would be faced with a difficult question of assessing its materiality under *Agurs,* whether there was a reasonable likelihood that it would have affected the jury. For purposes of deciding the effect of the timing of disclosure of the perjury, we are unwilling to say that the perjury was not material.[18] The greater significance that the Supreme Court accords to nondisclosure of perjury than to

---

17. The trial court had ruled earlier that the Government had to produce the requested statements of each witness before each witness testified, notwithstanding the magistrate's order that they be disclosed prior to trial. As our discussion of the district court's power to review decisions of the magistrate makes clear, this modification of the order was permissible.

18. The Government stresses the fact that Gunschel's purported motive for perjury was to protect defendants and others. Even accepting the rather thin evidence of this proposition, we would suggest that the motive for perjury, independent of the substance of the perjury, is not relevant to determining its materiality. Motive may be argued to the jury.

nondisclosure of exculpatory evidence, *see United States v. Agurs,* 427 U.S. at 103–14, 96 S.Ct. at 2397–402; *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959), confirms us in this decision.

We must inquire, then, whether the timing of the disclosure of Gunschel's perjury prevented appellants from preparing and presenting their cases effectively. Evidence that Gunschel had perjured himself emerged two days before he testified before the jury, when Gunschel was cross-examined on voir dire about his testimony before the grand jury that he had seen the defendants at the freezer in Marion. Evidence that Gunschel's grand jury testimony about Wahl and the lease of the freezer was perjurious was not revealed, however, until the end of the Government's direct examination of Gunschel. Appellants cross-examined Gunschel the following day. Looking to the factors relevant to evaluating timing of disclosure, we find that counsel had at least an overnight opportunity to digest the evidence and to prepare their cross-examinations of Gunschel. In addition, the principal effect of the evidence of perjury was to discredit Gunschel himself. Farrell testified about entirely unrelated matters, and there was little overlap between Sullivan's testimony and Gunschel's. Thus we conclude that the time of disclosure gave appellants adequate opportunity to prepare their defenses.

Kearns argues in effect that both the time and impact factors should be evaluated differently in his case: he assertedly predicated his trial strategy on the fact that Gunschel would contradict and discredit Sullivan, the only witness to link Kearns directly with the crime,[19] and for that rea-

son did not cross-examine Sullivan. Recalling Sullivan after Gunschel had testified would not, Kearns argues, have repaired the damage. The time when Gunschel's perjury was disclosed came after Kearns's trial strategy had been set in motion, and his prior preparation and presentation of his case was eroded. As to impact, the perjury, according to Kearns, destroyed the credibility of Gunschel on which Kearns had relied.

We do not agree that the time and impact factors were so critically affected in Kearns's case.[20] Kearns could not have placed such great reliance on Gunschel's testimony, nor could his decision not to cross-examine Sullivan have been much affected by Gunschel's perjury. Kearns's supposed reliance on Gunschel's ability to contradict Sullivan is misplaced for one of two reasons. First, Gunschel's testimony at trial did not include an identification of Kearns at the freezer (contrary to Sullivan's testimony), but the reason it did not was that the trial court had, during trial, suppressed the identification.[21] Kearns could not reasonably have relied very strongly on the fact that that evidence would be suppressed prior to its actual suppression. Alternatively, Kearns could have expected that Gunschel would testify consistently with his grand jury testimony that he had seen Kearns but could not remember where, in apparent contradiction to Sullivan's testimony that Kearns had been in Marion. Gunschel's trial testimony about his perjury revealed that he had seen Kearns in Marion. This change in testimony could not have affected Kearns's trial strategy much because Gunschel's expected testimony did not exonerate Kearns and could have been interpreted as consistent with Sullivan's testimony. Thus, because

---

**19.** The trial court suppressed Gunschel's pretrial identification of Kearns.

**20.** Kearns has directed us to *Woodcock v. Amaral,* 511 F.2d 985, 989 (1st Cir. 1974), *cert. denied,* 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975), for the proposition that where prosecutorial misconduct is involved, defendant prejudiced by delinquencies in disclosure need make little showing of materiality in order to obtain a new trial. We do remark on the Government's conduct, *infra,* but because the evidence here

was disclosed and because appellants were not prejudiced to any great degree, we do not believe a new trial is required. We leave open the possibility that in some circumstances late disclosure of evidence and prosecutorial misconduct may require reversal.

**21.** We assume that Kearns could properly have argued that Gunschel did not recall seeing Kearns in Marion.

Gunschel could not have figured as a significant counterweight to Sullivan, his perjury could not have had much impact on Kearns's case.

Moreover, had Kearns known of Gunschel's perjury before time came to cross-examine Sullivan, the knowledge could not have affected significantly his decision not to cross-examine Sullivan. Gunschel's perjurious testimony concerning identification of Kearns in Marion provided little basis, as noted above, for attempting to make Sullivan recant his recollections of Kearns. (The testimony relating to the lease was irrelevant as to Kearns.) Gunschel's perjury also undermined his own testimony generally, but no matter how Gunschel's credibility was affected, Kearns would not have risked anything by cross-examining Sullivan in the first place. The timing of the disclosure of Gunschel's perjury did not, therefore, deprive Kearns of due process.

■■■■ Having disposed of appellants' claim that late disclosure of Gunschel's perjury deprived them of due process, we must comment on the trial judge's decision to sanction the Government for the lateness by excluding otherwise valid pretrial identification evidence of three of the defendants. (Pretrial identification of Kearns was suppressed as being the result of an improperly suggestive identification procedure.) We agree that some sanction was probably appropriate, as much on the basis of prosecutorial misconduct as on the trial court's asserted basis of prejudice to the defendants. What concerns us is not what concerned the trial court. The trial court sanctioned the Government for the late disclosure of the identification perjury. We find troubling the fact that the Government made no mention of Gunschel's perjury respecting the lease until the end of Gunschel's direct testimony, even though the trial court had already expressed its displeasure with the Government's non-disclosure of the perjury about identification. Under different circumstances, this delay could have seriously jeopardized defendants' right to a fair trial. With respect to the sanction itself, we note that the trial

court has discretion to administer sanctions for abuse of discovery, *United States v. Richman*, 600 F.2d 286, 292 (1st Cir. 1979), which was essentially the situation here. In addition, the trial court does have available sanctions for disciplining attorneys "other than setting free the guilty or reenacting an insubstantially flawed trial . . . ." *United States v. Ramos Algarin*, 584 F.2d 562, 565 n.3 (1st Cir. 1978) (citing cases). We think the sanction should have focused on the United States Attorney personally rather than having distorted the trial process.

## IV. The Opening Statement and Argument of the Prosecutor

Appellants ask us to reverse their convictions because of allegedly improper arguments made by the prosecutor. The prosecutor is said to have violated five rules governing argument to the jury. According to appellants, he commented improperly on appellants' failure to testify, he referred to excluded evidence, he misstated crucial pieces of evidence, he improperly expressed personal beliefs, and he improperly made personal attacks on appellants and personal comments about their attorneys. The Government denies that comments were made on appellants' failure to testify and argues that, even if they were improper, the trial court cured any errors. The Government also asserts that comments on excluded evidence were addressed to appellants' own comments on it, that appellants, not the Government, misstated evidence, that the prosecutor did not express personal beliefs, and that the prosecutor did not attack appellants or their counsel.

This court has developed a considerable body of law governing comments by the prosecutor on defendant's failure to testify. The history of that development is recounted in *United States v. Flannery*, 451 F.2d 880, 881–82 (1st Cir. 1971), which supplies us with the still-controlling rule:

> [W]hen it is apparent on the record that there was no one other than himself whom the defendant could have called to contradict the testimony, we shall not

endeavor to weigh prejudice, but shall rule [descriptions of evidence as "uncontradicted"] prejudicial as [a] matter of law, with a single exception. If the court interrupts the argument, instructs the jury fully on the defendant's right not to testify and the jury's obligation not to draw unfavorable inferences and, in addition, states to the jury that the U.S. Attorney was guilty of misconduct, we may find no prejudice; otherwise we will reverse.

*Id.* at 882. This rule is more narrow than appellants would like. In *Flannery* and its precursors, such as *Rodríguez-Sandoval v. United States,* 409 F.2d 529, 531 (1st Cir. 1969), *cert. denied,* 414 U.S. 869, 94 S.Ct. 180, 38 L.Ed.2d 115 (1973), and *Desmond v. United States,* 345 F.2d 225, 227 (1st Cir. 1965), we were faced with situations where the prosecutor had referred explicitly to certain evidence as uncontradicted when the only source of contradiction was the defendant, who has a fifth amendment right not to take the stand. Such comments on defendant's failure to testify, absent the curative instruction outlined in *Flannery,* were, we held, reversible error. Our subsequent decisions have turned on a careful examination of the prosecutor's language and the evidence in the case. Where we have found the prosecutor's argument not improper, we have found that the comment was "sufficiently circumscribed and did not necessarily implicate appellant's assertion of his fifth amendment right." *United States v. Goldman,* 563 F.2d 501, 505 (1st Cir. 1977), *cert. denied,* 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978); *United States v. Hooker,* 541 F.2d 300, 307 (1st Cir. 1976). In both those cases, the prosecutor commented on the failure to impeach a Government witness during cross-examination. In another case, we balanced the arguably improper content of a statement not clearly directed to defendant's failure to testify against the quality of the curative instructions and found no reversible error. *United States v. Farnkoff,* 535 F.2d 661, 667–68 (1st Cir. 1976).

▪ Bearing in mind these guidelines, we review the specific comments of which appellants complain. Appellants first object to the following statement:

> And then [counsel for Wahl] asked Mr. Sullivan, isn't it a fact that your wife was fooling around with Stuart Wahl? Then did we hear any more about fooling around with wives? I think that we can dismiss that because not one of them said anything[.]

After objection, the trial court instructed the jury that a question is not evidence and that when a negative answer was given the jury was to disregard both the question and the answer.

Appellants contend that "them" referred to the appellants and was an improper comment on their failure to testify and that the instruction did not cure the error. We reject this argument because "them" appears to have included Sullivan, Farrell and Gunschel. Indeed, Sullivan denied that Wahl had had an affair with his wife. The prosecutor was only trying—albeit clumsily—to recall for the jury the exchange between Sullivan and Wahl's counsel. Moreover, the trial court gave a curative instruction, not a *Flannery* instruction, to be sure, but one equally suited under these particular facts to cure any prejudice. Appellants' cross-examination of Sullivan respecting an alleged affair was not properly in evidence in the first place because of Sullivan's denial, and the judge instructed the jury on that point. The prosecutor's comment was not directed to propping up the Government's evidence, the usual *Flannery* problem, but was directed to undermining what was not evidence to begin with. Thus any implication in the statement regarding appellant's failure to testify on this matter could not have influenced the jury.

▪ Appellants next maintain that the prosecutor made an improper remark during the following part of his rebuttal argument:

> [Counsel for Wahl] said where this case for three years since 1977. Well, you heard when Mr. Sullivan and Mr. Farrell began to cooperate. When they themselves got jailed up. That's when they

told the government. Not before. Where was this case for three years? Where was [counsel for Kearns's] corroboration? Well, ladies and gentlemen, you heard the details of what went on down there. *How can you corroborate what happened down at that freezer in Marion without the people that were there?* And Sullivan was there and Farrell was there and Gunschel was there and they told you—I'm sorry, Farrell wasn't there and he told you he wasn't there. But Sullivan and Gunschel were and they told you what they remembered about it.

(Emphasis added). Appellants did not object, but, after the closing arguments were completed, counsel for Kearns moved for a mistrial on the basis of this assertedly improper remark. The trial court agreed that the statement could have been construed as a comment on defendant's failure to testify, but ruled against Kearns because his instruction shortly thereafter on failure to testify following another objectionable remark (which we discuss below) cured the error. We disagree with the trial court as to the characterization of the statement. As we read it, the prosecutor's statement was directed to defendants' attack on the delay in prosecuting them; he argued that the Government could not proceed without the testimony of the people that were there, namely, Sullivan and Gunschel. But we rest our conclusion that no reversible error was committed on the fact that the prosecutor did not clearly suggest that defendants had a duty to testify together with the fact that moments after the prosecutor made this remark the trial court did give a proper instruction on failure to testify. *Cf. United States v. Farnkoff,* 535 F.2d at 667–68.

▆▆▆ Appellants do argue correctly that the prosecutor committed error in the following part of his rebuttal:

If Gunschel is such a liar why didn't he put Mr. Kearns in—

The antecedent of "he" is unclear, which renders the statement ambiguous as a possible comment on defendants', particularly Kearns's, failure to testify. Nevertheless, the reference to putting Kearns in could

well be interpreted as a suggestion that Kearns did not testify because he could not have contradicted Gunschel. This suggestion is unquestionably an improper comment on defendant's failure to testify, as the trial court found. The court promptly instructed the jury:

Mr. Bowens [the prosecutor], you have just argued a matter absolutely improper. I'll tell the jury right now that Mr. Bowens has just made a suggestion that there is a duty upon someone to testify in this case. There is no duty, not only not to testify but there is no duty to present any evidence whatsoever on the part of the defendants. It is improper for a prosecutor to argue, to even insinuate otherwise. So, you will disregard the argument that has just been made by Mr. Bowens.

Under *Flannery*, the trial court can cure error if it instructs the jury fully on defendant's constitutional right not to testify and on the jury's obligation not to draw unfavorable inferences therefrom, and if it states to the jury that the prosecutor was guilty of misconduct. Appellants argue that the instruction here did not meet these requirements because the jury was not told of defendant's "*constitutional* right not to testify" (emphasis in Kearns's brief) and because the jury was not instructed that it had an " '*obligation not to draw unfavorable inferences*' " (emphasis in Kearns's brief) from defendant's silence. These arguments are without merit. First, the trial court told the jury that the defendant had no duty to present evidence nor to testify. The absence of "constitutional" from the instruction cannot be considered determinative. In evaluating the facts the jury need only know that defendant has no duty to testify. Whether the right is located in the Constitution or elsewhere is irrelevant. Second, the trial court instructed the jury that "you will disregard the argument that has just been made by Mr. Bowens." In effect, the trial court told the jury not to draw unfavorable inferences from defendant's silence. If anything, the trial court's language "you will disregard" is stronger than the word "obligation" used in *Flannery*. Accordingly, we find the trial court cured the prosecutor's error.

Kearns particularly urges us to find reversible error in that part of the prosecutor's rebuttal where he suggested that, although Gunschel had not so testified, Kearns had been at Gunschel's freezer in Marion. Kearns argues that this statement was an improper reference to excluded evidence; the Government replies that it was an acceptable response to the appellants' mischaracterization of the evidence.

Without going into arguments advanced on both sides, we rejected Kearns's claim on the basis of the rule that where counsel fails to object to a closing argument and where, on objection, the trial court could have cured any error with an appropriate instruction, there is no reversible error unless there is plain error. *United States v. Stamas*, 443 F.2d 860, 862 (1st Cir.), *cert. denied*, 404 U.S. 851, 92 S.Ct. 86, 30 L.Ed.2d 90 (1971); *United States v. Cotter*, 425 F.2d 450, 453 (1st Cir. 1970); *cf. United States v. Somers*, 496 F.2d 723, 742 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974); *Garris v. United States*, 390 F.2d 862, 865 (D.C.Cir.1968). Counsel for Kearns did not object to the prosecutor's remark, and, if he had done so, the trial court could have cured any error with an appropriate instruction. There is no plain error. Even assuming that objection had been taken and that the prosecution had erred, we would find the prosecutor's remark harmless. In view of the evidence at trial, namely, Sullivan's testimony linking Kearns to the freezer in Marion and the fact that Gunschel did not contradict Sullivan, comments on Gunschel's testimony carried minimal weight.

Kearns argues that in closing argument the prosecutor misstated evidence against him that was so important and so prejudicial as to require reversal of his conviction. The Government replies that no misstatements were made but that even if they were, appellant failed to object to the statements and the trial court rendered any error harmless by instructing the jury that the closing arguments were not evidence and that the jury should rely on their own recollections of the testimony.[22]

Kearns relies on the general rule that

[i]t is a settled principle of law that the jury's consideration in a case should be limited to those matters brought out in evidence, and that summation should not be used to put before the jury facts not actually presented in evidence.

*United States v. Warren*, 550 F.2d 219, 229 (5th Cir. 1977), *cert. denied*, 434 U.S. 1016, 98 S.Ct. 735, 54 L.Ed.2d 762 (1978). *Accord, United States v. Suarez*, 588 F.2d 352, 354 (2d Cir. 1978); *United States v. Latimer*, 511 F.2d 498, 503 (10th Cir. 1975). Arguing evidence not presented is harmless error, however, if the judge, on objection, instructs the jury that closing arguments are not evidence and that the jury's recollections control, and if the absent evidence does not weigh heavily on the other evidence in the case. *United States v. Alessi*, 638 F.2d 466, 480 (2d Cir. 1980); *United States v. Somers*, 496 F.2d at 739–41 (3d Cir. 1974); *United States v. Lomprez*, 472 F.2d 860, 864 (7th Cir. 1972), *cert. denied*, 411 U.S. 965, 93 S.Ct. 2144, 36 L.Ed.2d 685 (1973).

Kearns objects to three statements of the prosecutor. First, according to Kearns, the prosecutor summarized the events at the meeting of Sullivan, Daggett, Flaherty, and Kearns at the Geneva Cafe on June 15 incorrectly. Specifically, Kearns complains that the prosecutor stated that Kearns had met Sullivan and joined the "partnership" before Daggett spoke with Farrell on the telephone and persuaded him to let them in on the deal, whereas Sullivan's testimony was that Kearns had arrived after the telephone call. The prejudice to him flowing from this mistake, Kearns asserts, was that he was connected with the conspiracy at the time Daggett, Farrell, Flaherty, and Kearns formed one, when in fact he had only performed a service for Daggett after the other four men had entered the conspiracy. Kearns also argues that the prejudice was aggravated

---

**22.** The Government insisted at oral argument, however, that its representation of the facts was correct and that it was not making a harmless error argument.

by the prosecutor's misstatement of Sullivan's reaction when Kearns met Sullivan at the Geneva Cafe; we find no misstatement here. We do, however, agree that the prosecutor erred in giving the impression (his remarks were garbled) that Kearns met Daggett, Flaherty, and Sullivan in the bar before Farrell was telephoned. The error was harmless because, although there was no objection, the judge instructed the jury before and after the trial that closing arguments were not evidence. Moreover, the prosecutor's error was not such as to prejudice the jury incurably. The mistake was slight, and a great deal of other evidence of Kearns's dealings with the other defendants and Sullivan showed that Kearns conspired with the others in disposing of the beef.

■ Second, Kearns objects to the prosecutor's statement that

... Sullivan knew all of these people. He had their phone numbers, although he didn't have Mr. Kearns['s] and he said he wasn't sure if he had Mr. Flaherty's at that time. But he knew them all.

Kearns contends that this statement attributes a prior knowledge of Kearns to Sullivan, which has no support in the record, and that it represents an improper attempt to argue guilt by association with Sullivan and the other defendants whom Sullivan knew. The Government asks us to accept the trial court's decision that evidence had been introduced from which the jury could infer that Sullivan knew Kearns. We reject Kearns's argument because we do not believe the prosecutor's statement suggested prior knowledge or that it argued guilt by association. At this point in his closing, the prosecutor argues only that Sullivan knew Kearns when the conspirators disposed of the meat. The point of the argument is that Sullivan is to be believed when he recalls the presence of the defendants; the point is not guilt by association.

■ Finally, Kearns attacks the prosecutor's statement that "[Farrell] heard [Kearns's] name mentioned and he heard his name mentioned by Daggett at his house and by Sullivan." In his testimony, Farrell recalled hearing Kearns mentioned

twice: once when Sullivan and Daggett visited his house after sending the beef to Providence (Farrell did not say who mentioned Kearns's name), and the second time when Daggett paid him and told him he also had to pay Kearns. The evidence does not support the statement that Sullivan mentioned Kearns's name or that Daggett mentioned it at Farrell's house, but it does show that either Sullivan or Daggett mentioned it at Farrell's house and that Daggett mentioned it at another time. This variance is too trivial to have prejudiced Kearns in any way, particularly in light of the judge's cautionary instructions to the jury about the nonevidentiary effect of counsel's arguments.

■ Appellants assert that the prosecutor improperly expressed his personal beliefs in opening and closing argument. We have said on several occasions that it is improper for the prosecutor to inject his personal beliefs about conclusions to be drawn from the evidence into his argument to the jury. *E.g., United States v. Gonzalez Vargas,* 558 F.2d 631, 633 (1st Cir. 1977); *United States v. Farnkoff,* 535 F.2d 661, 668 (1st Cir. 1976); *DeChristoforo v. Donnelly,* 473 F.2d 1236, 1238 & n.3 (1st Cir. 1973), *rev'd on other grounds,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The reason for this rule is that such arguments bring into play the false issue of credibility of counsel, in which the United States invariably has the advantage. *Greenberg v. United States,* 280 F.2d 472, 475 (1st Cir. 1960). Credibility of counsel is a false issue because it contravenes the truth-seeking function of a trial: the jury is told, in effect, that it should believe the Government because the Government is worthy of belief.

Appellants object to five statements made by the prosecutor and place particular emphasis on the following two statements in his opening statement to the jury:

Now, the reason that we're here this morning is that these defendants have pleaded not guilty to those crimes; and in so doing, we have placed the burden on the United States to prove their guilt and

action mentioned and to prove it beyond a reasonable doubt. The United States does not shrink from that burden. Indeed, we welcome it because the evidence will show that these defendants are in fact guilty of the crimes[.]

Now, at the end of all the evidence I will have the opportunity to address you again and at that time, based on the evidence, I will ask you to return verdicts of guilty on all counts against these defendants.

Objection was made to the first statement, but the trial court overruled it. In his closing argument, the prosecutor also made the following remarks:

I think, ladies and gentlemen, that [counsel for Flaherty's cross-examination of Marr] was just a little smoke to cloud the issue.

Mr. Haight [counsel for Kearns] could be trying to trip Mr. Farrell [during cross-examination], but I don't think that was the case.

Now, Mr. Baker [counsel for Flaherty] said that he had a different recollection of the facts than I. And I think that's very significant, ladies and gentlemen, because it shows that the lawyers in this case were all sitting there taking notes. . . . I think if not all, most of the lawyers stood up and said that we might have a different recollection of the facts and that our recollections might be different from yours.

■■■ The prosecutor's first statement is troublesome because, although no personal beliefs were stated directly, the jury was told of the Government's confidence that the evidence would show guilt beyond a reasonable doubt. On the other hand, the Government's confidence was not the reason given the jury to find the defendants guilty. Rather, the jury was told "the evidence will show that these defendants are in fact guilty." We hold that no reversible error occurred because neither the prosecutor's nor the Government's knowledge was

suggested as a basis for the jury's decision. This is a different comment than the one in *United States v. Farnkoff*, 535 F.2d at 668, where the prosecutor's comment was held improper. The distinction is that in *Farnkoff* the prosecutor did advance his personal opinion, together with evidence, as a basis for the jury's decision.[23]

■■■ Appellants' complaints respecting the other statements are without merit. The prosecutor's statement that the Government would ask the jury to return guilty verdicts does not bring the Government's credibility to bear on the case. The prosecutor's first two comments in closing argument are expressions of personal belief but go to such minor aspects of the evidence—Marr's testimony about the locks on the truck and Farrell's testimony about who said that the loaded rental truck was riding low on its springs, a matter going only to Farrell's credibility and only one of several factors bearing on his credibility—that they could not have had an impact on the other evidence showing appellants' guilt. Finally, the prosecutor's last assertion of personal belief concerned the conduct of the lawyers generally and did not represent an assertion of belief regarding the guilt of any defendant or even regarding conclusions to be drawn from any piece of evidence. The assertion did not add the prosecutor's credibility to any side of an issue that the jury had to decide.

Appellants' final contention respecting the prosecutor's arguments is that the prosecutor made improper personal attacks on the defendants and personal comments about their attorneys. The Government denies that any such derogatory statements were made and adds that if they were, they constituted a fair response to defense counsel's own personal attacks on the prosecutor and the Government's witnesses. It does counsel no credit to bring their personal sniping into this court; the sole case cited (and only by appellants) for our guidance is *United States v. Williams*, 496 F.2d 378 (1st Cir. 1974).

---

**23.** The prosecutor asked the jury to "come to the decision which I think you should come to, based upon the evidence, that the defendant is

guilty as charged." *United States v. Farnkoff*, 535 F.2d 661 (1st Cir. 1977).

Before examining *Williams*'s application to the prosecutor's statements about the defendants, we pause briefly to consider the claim respecting the prosecutor's comments about defense counsel, which we find without merit. The prosecutor's remarks about the cross-examinations by counsel for Daggett and Wahl attempted to rehabilitate the Government witnesses and to rebut (albeit in advance) Wahl's claim that he was involved in a fish conspiracy but not in the beef conspiracy. These remarks did not touch the reputation or ability of counsel and were not calculated to inflame the jury. Moreover, no objection was made to them. The prosecutor did suggest that counsel for Kearns had attempted to "trip" a witness, but the trial court sustained an objection to the comment and told counsel not to remark on other counsel. This remedy was sufficient in the circumstances, and we do not see how the jury could have been affected by the comment. By contrast, these remarks do not rise (or sink) to the level of derogatory comments on successful objections to evidence, which together with other comments constituted reversible error in *United States v. Gonzalez*, 488 F.2d 833, 836 (2d Cir. 1973).

In *Williams*, we noted as "utterly unacceptable" a statement by the prosecutor that in effect included defendants in a group of "characters of the underworld . . . a bunch of rats with a bunch of names." We declined to reverse, although we observed that we might, under our supervisory powers, do so in similar circumstances in the future. The remarks of the prosecutor are, of course, subject to the harmless error rule, Fed.R.Crim.P. 52(a), and must be evaluated in light of the circumstances of the trial. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238–42, 60 S.Ct. 811, 851–53, 84 L.Ed. 1129 (1940); *Patriarca v. United States*, 402 F.2d 314, 321–22 (1st Cir. 1968), *cert. denied*, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969).

Appellants complain specifically about two remarks by the prosecutor in his rebuttal. First, in an effort to rehabilitate Farrell, Gunschel, and Sullivan, the prosecutor said that "sometimes it takes a thief to know a thief." Second, responding to counsel for Daggett's characterization of the principal Government witnesses as "garbage," the prosecutor remarked, "[b]ut, ladies and gentlemen, who were they [the Government witnesses] dealing with? These defendants."

Even if these remarks fall within the proscription of *Williams*, they do not require a new trial. The error in *Williams* was harmless because of the trial court's prompt curative instructions. The trial court here did not make similar instructions, but two other circumstances neutralized any harm flowing from the prosecutor's remarks. First, defense counsel first referred to the Government witnesses explicitly as "thieves" and "garbage," inflammatory statements meant to appeal to the passions of the jury. The prosecutor was entitled to attempt to rehabilitate his witnesses, and when defense counsel makes inflammatory statements, we will allow the prosecutor somewhat greater leeway in rebuttal. *See United States v. Medina*, 455 F.2d 209, 210 (1st Cir. 1971) (criticism of Government witnesses may invite zealous rejoinder); *cf. United States v. White*, 486 F.2d 204, 206 (2d Cir. 1973), *cert. denied*, 415 U.S. 980, 94 S.Ct. 1569, 39 L.Ed.2d 876 (1974) (dictum) (intemperate remarks at end of long and hotly contested trial are harmless error). We do not hold, however, that the prosecutor has free rein once defense counsel makes inflammatory remarks or even that in this case, the statements by defense counsel alone rendered the prosecutor's error harmless. "[W]e do not consider that a trespass by the defense gives the prosecution a hunting license exempt from ethical restraints on advocacy." *Patriarca v. United States*, 402 F.2d at 321 (footnote omitted). The second circumstance takes us the rest of the way to that conclusion: the evidence of appellant's guilt was substantial. *United States v. Cotter*, 425 F.2d at 453. We again remind Government counsel, however, that remarks of this kind involve a serious risk that a conviction will be reversed. *United States v. Williams*, 496 F.2d at 384.

## V. *The Jury Instructions*

Appellants claim that the trial court's instructions contained improper comments on their right to remain silent and denied them their right to a verdict independently arrived at by each juror. Appellants further argue that the trial court's use of slide-projected transparencies, photocopies, and tape recordings to present instructions aggravated the prejudice to them. To begin with, we observe that in ·*United States v. Previte,* 648 F.2d 73, 84–85 (1st Cir. 1981), we recently had occasion to consider this same trial judge's use of slide-projected transparencies and tape recordings in giving instructions, although in that case we found merely no plain error. In this case, appellants objected in timely fashion.

The instructions objected to include two instructions by the court at the very beginning of the trial. The court had prepared a transparency labelled "Trial, Fundamental Principles" that was projected on the wall. Two points he made were:

1. The FUNCTION of trial attorneys is to present evidence and to argue its effect.

 . . . .

6. The privilege against self-incrimination is constitutional. Jury may not make inference of guilt from decision of defendant not to testify.

The trial court explained these principles at greater length while the transparency was shown. At their request, the jury later received photocopies of the "Fundamental Principles" to take with them into deliberations. Appellants complain that, under the first principle, the jury could have taken appellants' legitimate decisions not to present evidence as a failure to fulfill this duty and counted it against them. They object to the link in the sixth principle between the right to remain silent and the privilege against self-incrimination. In his final charge, the trial court used a tape recording of his own voice to give the rea-

sonable doubt instruction. The pertinent parts of that instruction are as follows:

Proof beyond a reasonable doubt is proof that satisfies your collective judgment, acting as reasonable persons, that the crime charged was committed by the defendant and satisfies you so as to exclude any other reasonable conclusion.

. . . .

I repeat, therefore, the burden of the government is to prove the essential elements of the crime charged to a degree of persuasion or certainty that satisfies the collective judgment of the jurors and leaves them clearly persuaded of guilt[.]

Appellants claim that the words "collective judgment" deprived them of the right to a verdict independently arrived at by each juror.

We turn first to appellants' contention that the "Fundamental Principles" led the jury to infer that the failure to present evidence was a dereliction of duty and that failure to testify was an indication of guilt.[24] The trial court is forbidden to comment on the silence of the defendant as an indication of his guilt. *See Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The test for determining whether the trial court has made an improper comment is

whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.

*Davis v. United States,* 357 F.2d 438, 441 (5th Cir.), *cert. denied,* 385 U.S. 927, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966), *quoting Knowles v. United States,* 224 F.2d 168, 170 (10th Cir. 1955). We have already adopted this test for evaluating comments by the prosecutor. *Borodine v. Douzanis,* 592 F.2d 1202, 1210 (1st Cir. 1979); *Lussier v. Gunter,* 552 F.2d 385, 389 (1st Cir.), *cert. denied,* 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 124 (1977). Examining the two "Fundamental Princi-

---

24. Under *United States v. Previte,* 648 F.2d 73 (1st Cir. 1981), we will scrutinize carefully instructions, such as the one here, that are emphasized visually. *Id.* at 85. We will not, however, apply this "high standard" in this case

because our decision in *Previte* was not announced until after the trial in this case. Even were we to do so, however, we doubt we would find reversible error.

ples," we cannot say that they were intended or would be taken as comments on the failure to testify. The first principle, regarding the function of trial attorneys, is merely a broad explanation for persons new to the courtroom of what the lawyers will do. It contains no suggestion that they have a duty to present evidence. The second principle presents a closer question because it suggests that there is a connection between the privilege against self-incrimination and a defendant's decision not to testify. In the statement itself, however, the jury was forbidden to draw an inference of guilt from a defendant's failure to testify. Furthermore, the trial court's oral explanation of this principle before trial and his instructions at the end both contained discussions of nonincriminating reasons that would prompt a defendant not to testify. Another principle presented to the jury stated that a defendant had no duty to testify or to present evidence. In these circumstances, we do not believe that the trial court intended to comment on the appellants' failure to testify or that the jury would "naturally and necessarily" take it to be such. We would, nevertheless, recommend to the trial court that, if he continue to use it, he revise this principle to divorce totally the privilege against self-incrimination from the right not to testify.

Appellants have brought several cases to our attention involving comments by the trial court, but we do not find them persuasive. The one case in which the comment resulted in reversal involved a statement to defense counsel in the presence of the jury to the effect that defendants' testimony was the only way defendants could impeach the prosecution's witness. *Davis v. United States*, 357 F.2d at 440–41. In *United States v. Martin*, 511 F.2d 148, 152 (8th Cir. 1975), an instruction noting the defendant's right "to say to the Government, in effect, 'Prove me guilty if you can'" was held to be not plain error. Finally, in *United States v. Trevino*, 565 F.2d 1317, 1320 (5th Cir.), *cert. denied*, 435 U.S. 971, 98 S.Ct. 1613, 56 L.Ed.2d 63 (1978), an instruction similar to the one here was held to be not plain error because of circumstances not relevant here.

Respecting the tape-recorded reasonable doubt instruction, appellants' claim that the phrase "collective judgment" deprived them of a verdict individually arrived at by each juror has no merit. In *Pallotta v. United States*, 404 F.2d 1035, 1039 (1st Cir. 1968), we directed that instructions must inform the jury that their decision must be unanimous and must be the product of each juror's independent judgment. The trial court instructed the jury to "consider the case of each person individually and make up your mind individually with respect to the charge against each person...." One of the "Fundamental Principles" also instructed the jury that its decision must be unanimous. After the verdict, each juror was polled, which confirmed the unanimous decision. The trial court's instructions and actions thus satisfied the requirements of *Pallotta* and outweighed whatever error the phrase "collective judgment" created. We would note that that error was not large in the first place. The phrase appears only twice in the tape recording, and the recording focuses on the meaning of reasonable doubt, not on how the jury should decide as a group. Although we find no reversible error here, we would suggest that the trial court eschew use of "collective judgment" in the future.

Turning to the manner in which the trial court gave some of its instructions, we reaffirm what we said in *Previte*. We leave to the discretion of the trial court its method of presenting instructions to the jury, but when methods move beyond live oral instructions, we urge trial courts to avoid distortions that may result from the use of different media. In this case, we find no such unfair distortion. With respect to sending instructions such as "Fundamental Principles" in with the jury, we repeat our concern in *Previte*, that the troubling aspects of the instructions are errors of omission rather than of commission.

## VI. *The Peremptory Challenges*

All parties, including the Government, objected to the procedure imposed by the

court for exercising peremptory challenges, which was as follows:

> THE COURT: The judge has determined that the names of 33 potential jurors shall be drawn. This is after the exercise of the usual questions for cause. The names of 33 persons shall be drawn. The government shall be entitled to strike seven of those 33 names, and the defendants, as a group, shall be entitled to strike 12 of those 33 names. The government shall not disclose to the defendants the names of the persons it seeks to strike nor shall the defendants disclose to the government the names of the 12 persons they wish to strike.

> After those names have been stricken, we will then have a minimum of 14 persons remaining. The first 12 names that have been chosen plus two subsequently thereafter that still remain on the panel shall constitute the 12 jurors to sit on the case and the two alternates.

 This method undoubtedly speeds up the challenging process. Unfortunately, it also runs afoul of Federal Rule of Criminal Procedure 24(c) which specifically provides for separate challenges to alternate jurors:

> Each side is entitled to 1 peremptory challenge in addition to those otherwise allowed by law if 1 or 2 alternate jurors are to be impanelled, 2 peremptory challenges if 3 or 4 alternate jurors are to be impanelled, and 3 peremptory challenges if 5 or 6 alternate jurors are to be impanelled. The additional peremptory challenges may be used against an alternate juror only, and the other peremptory challenges allowed by these rules may not be used against an alternate juror.

Despite the clear transgression of the rule, we do not perceive how defendants' exercise of their peremptory challenges was curtailed in any way. Under Federal Rule of Criminal Procedure 24(b), the defendants jointly were entitled to 10 peremptory challenges. They were also entitled to 2 additional challenges because it was decided to use 2 alternates. We do not think that combining the regular and alternate challenges amounts to a violation of defendants' substantial rights. *See United States v. Taylor*, 562 F.2d 1345, 1354–55 (2d Cir.), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977). This, however, does not put our imprimatur on the court's procedure for the exercise of peremptory challenges. We recognize that this method has been followed by other judges. But this does not make it right. Until and unless the rule is changed, its provisions should be followed. We wish, however, to make it clear that it is the combining of regular and alternate challenges that we condemn, not the practice of having the Government and defendants challenge the potential jurors as a group.

VII. *The Trial Judge Alone with the Jury*

 At one point during the trial, the court ordered all counsel and all defendants, together with the then-testifying witness, Gunschel, to leave the courtroom so that the prosecutor could instruct Gunschel about his testimony.[25] The judge was left alone with the jury. Appellants claim that this amounted to an ex parte communication to the jury which violated Federal Rule of Criminal Procedure 43(a), *Rogers v. United States*, 422 U.S. 35, 38–41, 95 S.Ct. 2091, 2094–95, 45 L.Ed.2d 1 (1975), and their sixth amendment right to be present at trial, *Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970). Appellants concede that not all ex parte communications between the trial court and the jury are improper, but argue on the basis of *United States v. Gay*, 522 F.2d 429, 435 (6th Cir. 1975),[26] that where no record of the contents of the communication exists, prejudice must be assumed. Here, however, there is no evidence that any communication was made; appellants ask us in effect to extend *Gay* by presuming prejudice when

---

**25.** Although it is not relevant here, the reason for the instruction of Gunschel was that the trial court wanted to ensure that Gunschel would observe the suppression of Gunschel's pretrial identification of Kearns.

**26.** Other courts, too, have held that ex parte communications between judge and jury are presumptively prejudicial, *United States v. Taylor*, 562 F.2d 1345, 1365 (2d Cir.), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083

the judge is alone with the jury. Although we are wary of even the possibility of ex parte communications, we

> hesitate to presume that prejudice resulted in the absence of some plain showing to that effect. We have enough confidence in the integrity and fairness of the District Judges to assume that they will not make unfair remarks to jurors....

*United States v. Woodner*, 317 F.2d 649, 652 (2d Cir.), *cert. denied*, 375 U.S. 903, 84 S.Ct. 192, 11 L.Ed.2d 144 (1963) (citations omitted).

We agree that ex parte communications between the judge and the jury create a presumption of prejudice and violate both Federal Rule of Criminal Procedure 43(a) and the sixth amendment. Even actual communications, however, are subject to the harmless error rule. Fed.R.Crim.P. 52(a), *Rogers v. United States*, 422 U.S. at 40, 95 S.Ct. at 2095. But a heavy burden is on the Government to show that no prejudice resulted, *see Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954).[27] In order to create an adequate record for review, the trial judge should make a record of any of his communications with the jury. *United States v. Gay*, 552 F.2d at 435. The crucial question for us is how far these rules apply when the evidence shows only that the judge is alone with the jury and not that any communication occurred. Where there is no ex parte communication, there can, of course, be no error. Because a court reporter was present during the absence of the parties and counsel and because we assume that absent an instruction on the record to go off the record (as there had been in other instances during the trial), anything that transpired would have been recorded, the silence of the record shows that no communication occurred. Thus, there was no prejudice to appellants.

Some observations are required. The judge's presence alone with the jury is almost as "pregnant with possibilities for error," *United States v. United States Gypsum Co.*, 438 U.S. at 460, 98 S.Ct. at 2885, as any communications he actually has with the jury. The safest course would have been to dismiss the jury. We appreciate that the court's motive in sending counsel and defendants out rather than the jury was to reduce the waste of time involved in sending the jury out and then recalling them. This, however, is secondary to the problems inherent in a judge being alone with the jury for any appreciable period of time.

*The convictions are affirmed.*

---

(1977); *United States v. Treatman*, 524 F.2d 320, 323 (8th Cir. 1975). *See United States v. United States Gypsum Co.*, 438 U.S. 422, 460, 98 S.Ct. 2864, 2885, 57 L.Ed.2d 854 (1978) ("[a]ny ex parte meeting or communication between the judge and the foreman of a jury is pregnant with possibilities for error.")

27. Other courts differ over the quantum of the burden imposed on the Government. *Polizzi v. United States*, 550 F.2d 1133, 1138 (9th Cir. 1976) (Government must show error harmless beyond reasonable doubt); *United States v. Treatman*, 524 F.2d 320, 323 (8th Cir. 1975) (Government must present evidence giving clear indication of lack of prejudice); *United States v. Reynolds*, 489 F.2d 4, 8 (6th Cir. 1973), *cert. denied*, 416 U.S. 988, 94 S.Ct. 2395, 40 L.Ed.2d 766 (1974) (Government must rebut "any reasonable possibility of prejudice"). Finding no error in this case, we have no occasion to decide what standard should control in this court.